BOMAR et al. v. SMITH et al. (No. 7629.)

(Court of Civil Appeals of Texas. Dallas. March 10, 1917. Rehearing Denied June 16, 1917.)

1. USURY ⬧119—JURY QUESTION.

Whether a 10 per cent. payment was a bona fide commission for obtaining a loan or intended as additional interest, thereby rendering the loan usurious, held a jury question, although the alleged brokers paid part of such sum to certain of the lenders.

[Ed. Note.—For other cases, see Usury, Cent. Dig. §§ 343–357.]

2. USURY ⬧88 — PURGING CONTRACT OF USURY.

A contract may be purged of usury by a subsequent agreement.

[Ed. Note.—For other cases, see Usury, Cent. Dig. §§ 176–187.]

3. USURY ☞119 — PURGING CONTRACT OF USURY—JURY QUESTION.

Whether any usury in a loan contract was purged by a subsequent compromise agreement yielding certain considerations to the borrower, consisting of an option and notes the values of which are not definitely shown, is a jury question.

[Ed. Note.—For other cases, see Usury, Cent. Dig. §§ 343–357.]

4. MORTGAGES ☞497(1) — FORECLOSURE — JUDGMENT—OPERATION.

A judgment foreclosing mortgage liens, etc., intended simply to change the form of the securities held by the judgment creditors, can be enforced only to the same extent as the principal debt could have been.

[Ed. Note.—For other cases, see Mortgages, Cent. Dig. §§ 1469, 1471, 1473.]

5. MORTGAGES ☞497(1) — FORECLOSURE — JUDGMENT—OPERATION—JURY QUESTION.

Whether a judgment foreclosing mortgage liens, etc., was intended simply to change the form of the judgment creditors' security is a jury question, where the suit was instituted by agreement, some differences arose between the parties during its progress, but judgment was finally entered pursuant to agreement.

[Ed. Note.—For other cases, see Mortgages, Cent. Dig. §§ 1469, 1471, 1473.]

6. JUDGMENT ☞713(2)—CONCLUSIVENESS.

Ordinarily a judgment is conclusive not only as to the subject-matter determined, but as to other matters which might have been litigated.

[Ed. Note.—For other cases, see Judgment, Cent. Dig. §§ 1063, 1066, 1099, 1241.]

7. USURY ☞111(1)—PLEADING.

Under the direct provisions of Vernon's Sayles' Ann. Civ. St. 1914, art. 4983, a defense of usury must be interposed by a special plea under oath.

[Ed. Note.—For other cases, see Usury, Cent. Dig. §§ 272–296, 300, 301.]

8. USURY ☞18—LOAN.

A loan out of which the lenders retain 10 per cent. in addition to interest is usurious.

[Ed. Note.—For other cases, see Usury, Cent. Dig. §§ 31–34, 36–38, 40.]

9. USURY ☞119—JURY QUESTION.

Whether certain lenders received part of the money paid for negotiating a loan was made a jury question by evidence regarding the amount with which their accounts were charged by a trust company handling the transaction, although there was no direct testimony that they received part of such sum.

[Ed. Note.—For other cases, see Usury, Cent. Dig. §§ 343–357.]

10. USURY ☞85—WHAT CONSTITUTES.

Any usury in a transaction by which parties arranging a loan retained 10 per cent. thereof would not be eliminated merely because part of the lenders did not receive part of the amount retained.

[Ed. Note.—For other cases, see Usury, Cent. Dig. § 168.]

11. USURY ☞88 — PURGING CONTRACT OF USURY.

Where a borrower gave the lenders an option to purchase the property securing the loan, and later secured a release from such agreement by giving his notes, any usurious element was eliminated by a later contract providing for the cancellation of such notes if the borrower did not redeem his property after foreclosure, and such property was not redeemed.

[Ed. Note.—For other cases, see Usury, Cent. Dig. §§ 176–187.]

12. USURY ☞119—JURY QUESTION.

Whether an option for the purchase of property exacted from the borrower by the lenders was intended to afford a profitable investment or to obtain a consideration in addition to the interest on the loan, thereby rendering it usurious, held a jury question.

[Ed. Note.—For other cases, see Usury, Cent. Dig. §§ 343–357.]

13. MONOPOLIES ☞12(2) — COMBINATIONS TO RESTRAIN TRADE.

Where a man who was either owner or mortgagee in possession of a power plant procured the shutting down of a competing plant to eliminate its competition, the anti-trust laws were not violated, since neither capital, skill, nor acts were combined to accomplish the purpose.

[Ed. Note.—For other cases, see Monopolies, Cent. Dig. § 10.]

14. MORTGAGES ☞535(1) — FORECLOSURE BY ACTION—PURCHASERS' RIGHTS.

The rights of a purchaser at a mortgage foreclosure sale are subject only to liens acquired previous to the sale.

[Ed. Note.—For other cases, see Mortgages, Cent. Dig. § 1556.]

15. MORTGAGES ☞194—MORTGAGEE IN POSSESSION—RIGHTS AND DUTIES.

A mortgagee in possession must exercise ordinary care in managing the property, and should be reimbursed for necessary expenses of operation and improvement.

[Ed. Note.—For other cases, see Mortgages, Cent. Dig. §§ 498–502.]

16. JUDGMENT ☞251(1) — CONFORMITY TO PLEADING—NECESSITY.

In suit to restate an account because of usury, etc., a judgment establishing a lien not pleaded is erroneous.

[Ed. Note.—For other cases, see Judgment, Cent. Dig. § 437.].

17. APPEAL AND ERROR ☞1056(1) — HARMLESS ERROR—EXCLUSION OF EVIDENCE.

Excluding a chancery master's report duly excepted to is not reversible error.

[Ed. Note.—For other cases, see Appeal and Error, Cent. Dig. §§ 4187, 4191, 4207.]

18. VENUE ☞22(1) — RESIDENCE OF DEFENDANTS.

Where suit to restate an account because of usury, etc., was brought in the county where two of the defendants resided, pleas of privilege of nonresident defendants were properly overruled.

[Ed. Note.—For other cases, see Venue, Cent. Dig. § 35.]

Appeal from District Court, Dallas County; W. F. Whitehurst, Judge.

Suit by W. B. Smith, as trustee, and others against D. T. Bomar and others. From a judgment favorable to plaintiffs and certain defendants, D. T. Bomar and other defendants appeal. Reversed and remanded.

D. T. Bomar, George Thompson, J. H. Barwise, R. W. Flournoy, W. Storer, and Leroy A. Smith, all of Ft. Worth, for appellants. W. H. Clark, Joseph E. Cockrell, and Etheridge, McCormick & Bromberg, all of Dallas, and Capps, Cantey, Hanger & Short, of Ft. Worth, for appellees.

TALBOT, J. This suit was instituted by W. B. Smith, as trustee, and by J. H. Moore, W. B. Smith, and J. Merrick Moore, as part-

ners composing the law firm of Moore, Smith & Moore, in the district court of Dallas county, Tex., against D. T. Bomar, J. D. Beardsley, Fidelity Trust Company, and others. From a judgment favorable to the plaintiffs and some of the defendants, D. T. Bomar and the other defendants appealed. The record and briefs filed in this court are very voluminous. The transcript, including the plaintiffs' petition of 68 pages and the several answers and pleas of the defendants, covers 732 pages. The statement of facts covers 2,158 pages. The original brief of the appellants covers 517 pages, and that of the appellees 155 pages. There are also two or three small supplemental briefs on file.

It appears that in the year 1906 J. D. Beardsley acquired an interest in several hundred acres of land adjacent to the city of Mineral Wells, in Palo Pinto county, Tex., with the view of dividing a part, if not all, of it into lots and blocks to be sold for residence purposes. The title to these lands was vested in the Central Texas Realty Company, 52 per cent. of the capital stock of which Beardsley owned. A part of the purchase money of said land was paid in cash, and notes secured by vendor's lien given for the balance. Beardsley also purchased a block of land situated in said city of Mineral Wells, known as the Hawthorne Wells property, agreeing to pay therefor the sum of $25,000. Of said amount he paid $15,000 cash, and gave vendor's lien notes for the remainder. His plan for the development of these properties was to construct through the said city of Mineral Wells and through said lands an electric street railway, and as an investment, to be operated in connection with such railway, he desired to build an electric light plant and an ice plant. To that end he obtained franchises from said city. He did not have sufficient money to make the improvements contemplated, and decided to borrow $200,000 for that purpose. In addition to the lands mentioned Beardsley owned 505 bonds of the Louisiana & Northwestern Railroad Company, which operated a line of railroad from the town of Magnolia, in the state of Arkansas, to Natchitoches, in the state of Louisiana. These bonds were incumbered, a part of them having been hypothecated with Geo. W. Hunter, of St. Louis, Mo., to secure an indebtedness against said railroad and the others attached in a suit brought by A. C. Wisner against Beardsley in said city of St. Louis. In January, 1907, Beardsley acquired from R. K. Wylie and wife a block of land No. 36, situated in the French addition to the city of Mineral Wells, giving as a part of the purchase money therefor his notes aggregating $3,000 or more, payable respectively on or before the 1st days of January, 1908 and 1909, to secure the payment of which the vendor's lien was reserved upon said land. Upon this block of ground the electric light and ice plants which

Beardsley contemplated building were constructed after he secured the loan of $200,000, as hereinafter stated. The properties mentioned, incumbered as stated, together with the improvements Beardsley contemplated making, constituted practically all the security, as we understand the record, that he had to offer for the loan desired, and he testified before the master in chancery, which was used upon the trial in the district court, as follows:

"The attachment of the bonds by Wisner considerably complicated my situation in regard to getting money to carry out the Mineral Wells enterprise, to which I was previously committed. It was much more difficult for me to raise the money."

In the early part of October Beardsley met D. T. Bomar and Ed S. Hughes in the passenger station of the Texas & Pacific Railway Company at Dallas, and informed them that he was desirous of obtaining a loan of $200,000 with which to make the contemplated improvements in Mineral Wells, and, according to the testimony of the said Bomar, stated that he would be willing to pay 6 per cent. interest for the loan of the money and "a brokerage of 10 per cent." of the amount thereof to the person who would secure the loan, proposing as security the railroad bonds mentioned above, and a mortgage or deed of trust on the Hawthorne Wells property, heretofore referred to, and also on the electric light and ice plants when they should be erected. Bomar and Hughes, immediately after this meeting with Beardsley, set about to secure the co-operation of others with them in making the loan of $200,000 desired by him or to find persons who would be willing to form a syndicate and make such loan. For this purpose a number of people were approached by both Bomar and Hughes, and Bomar went to St. Louis, Beardsley agreeing to pay his expenses, to investigate the condition of the railroad bonds offered by Beardsley as a part of the security for the loan, in order that he might be able to report their condition and probable value as such security to the persons he was trying to induce to make the loan. There is also evidence to the effect that Ed S. Hughes told Bomar that he would not co-operate with him in obtaining the loan of $200,000 unless Beardsley would give to them an option to purchase a one-half interest in Beardsley's Mineral Wells properties at cost, plus interest, and that Morgan Jones also requested Bomar to secure such option; that such option was given by Beardsley, and later canceled in consideration of two notes of Beardsley, one for $20,000, and the other for $1,600, said note for $1,600 being for the interest to accrue on the said note for $20,000. The 505 railroad bonds mentioned were pledged to secure the payment of these two notes, and they were sold under such pledge on the 28th day of November, 1908, and purchased by the Fidelity Trust

Company. The negotiations and efforts to secure the loan of $200,000 continued for about one month, and resulted in the formation of a syndicate for that purpose, composed of D. T. Bomar, Ed S. Hughes, Morgan Jones, and others. The syndicate being thus formed, D. T. Bomar notified Beardsley that he was "ready for a conference," and on November 15, 1906, they met at Ft. Worth, and what is known as the collateral trust agreement was executed. Bomar testified that when he sat down to put this agreement in writing it occurred to him that it was desirable that they have a trustee, that the Fidelity Trust Company, being a corporation of which he was president and Morgan Jones a director, was agreed upon to act as trustee, and that the insertion of the name of Fidelity Trust Company as trustee in the written agreement was purely for the purpose of having it act as such trustee in carrying out the already existing agreement between Beardsley and himself and associates. The said collateral trust agreement, after reciting that the said J. D. Beardsley is the owner of the Hawthorne Wells property hereinbefore referred to and a third interest in about 1,400 acres of land lying adjacent to the town of Mineral Wells and certain other real estate, and after further reciting that the said Beardsley is the owner of a franchise granted by the city of Mineral Wells for the erection, maintenance, and operation of a street car line, electric light, and ice plants in said city, and that the said Beardsley is desirous of procuring the services of the Fidelity Trust Company in the matter of the organization of the necessary corporation or corporations for the construction and operation of said plants, the issuance of bonds to be secured by a mortgage thereon, and the procuring of the remainder of the money necessary to be used in the construction of said plants, provides, among other things, that the said Beardsley shall execute and deliver to or upon the order of the Fidelity Trust Company his promissory notes, payable to D. T. Bomar (the president of said company), aggregating the sum of $200,000, bearing date November 15, 1906, and to become due on the 31st day of December, 1908, and bearing interest from date at the rate of 8 per cent. per annum, interest payable semiannually. This agreement further provides that the Fidelity Trust Company shall credit to the account of the said Beardsley the proceeds arising from the sale of said notes as fast as same is required for use under the terms of said agreement, and that same shall be paid out only for such purpose and under such restrictions and safeguards as may be prescribed by said Fidelity Trust Company. Attached to this contract and executed contemporaneously therewith is a separate agreement signed by the said J. D. Beardsley, the substance of which is that for a valuable consideration Beardsley promises to pay to or upon the order of the Fidelity Trust Company a sum equal to 10 per cent. of all or such amount of the $200,000 of notes executed by Beardsley to D. T. Bomar under the terms of said contract of date November 15, 1906, as said company shall cause to be sold for the construction of the plants therein mentioned, and authorizing said Fidelity Trust Company to charge "said commission of 10 per cent." on the amount so sold and credited to the said Beardsley account as its compensation for obtaining said loan of $200,000. This agreement was attached to only one copy of the contract of November 15, 1906, which copy was kept in Bomar's office. Other copies of said contract to which said agreement was not attached were used in soliciting purchasers of Beardsley's notes to be executed for said loan. This contract further stipulates that in consideration of $10 cash and other valuable considerations Beardsley sells to the Fidelity Trust Company an exclusive option to purchase a one-half undivided interest in all the properties owned by the said Beardsley in Mineral Wells, Tex., at the net cost thereof plus the interest on such cost at 8 per cent. per annum and a half interest in all the capital stock and bonds of such a corporation as may be organized for the purpose of operating the plants at said city of Mineral Wells. Beardsley executed the notes called for in the said collateral trust agreement, which are called "collateral trust notes," and they were indorsed and delivered to the several purchasers, Beardsley receiving of the proceeds arising from the sale thereof in cash only the sum of $180,000, $20,000 of said proceeds being reserved and retained by Bomar and his associates in the transaction. The respective purchasers of said notes and the aggregate amounts of the notes taken by each were as follows: Morgan Jones, $70,000; F. W. Hughes, $65,000; Fidelity Trust Company, $30,000; D. T. Bomar, $11,800; Mattie E. Broad, $10,000; D. B. Keeler, $10,000; Miss Douglass Bomar, $2,100; Mrs. S. J. Roth, $1,100.

D. T. Bomar testified, in effect, that he and Ed S. Hughes agreed to give Morgan Jones a part of the commission Beardsley agreed to pay them for obtaining the $200,000 loan, and that Morgan Jones, Mr. Hughes and himself were to participate in all the benefits flowing from said loan; that the $20,000 "commission" stipulated in the agreement with Mr. Beardsley, which was attached to the collateral trust agreement, was the commission Beardsley had agreed to pay to Ed S. Hughes and himself, and was divided between the said Hughes, Morgan Jones, and himself, except $3,000 thereof; that in order to raise the loan desired by Beardsley it became necessary that the Fidelity Trust Company take $30,000 of his notes, and that it received $3,000 of said "commissions."

Ed S. Hughes testified, in effect, that he induced his brother, F. W. Hughes, of North Carolina, to purchase notes given by Beardsley for the loan in question aggregating $65,000; that he indorsed those notes because he guaranteed the principal of them; and that he divided that part of the "commission" he received under the agreement with J. D. Beardsley with his brother, F. W. Hughes. It is denied by Bomar in his testimony that Mrs. Broad, Mrs. Roth, Miss Douglass Bomar, and D. B. Keeler, who purchased some of the Beardsley notes as stated, got any part of the alleged commission of $20,000, and there is no direct testimony that any of them did.

There is evidence showing that Mrs. Broad bought note No. 3 for $10,000; that this note was indorsed by D. T. Bomar; that Mrs. Broad's account with the Fidelity Trust Company was charged on December 10, 1906, with $9,700, and J. D. Beardsley's account credited with $9,000; and that the fee account of the Fidelity Trust Company credited with $700. There is also evidence showing that similar charges and credits with respect to the notes purchased by D. B. Keeler, Mrs. S. J. Roth, and Miss Douglass Bomar and the amounts paid therefor respectively were made on the books of the Fidelity Trust Company. In addition to the $200,000 loan mentioned, Beardsley in July, 1907, borrowed from the Fidelity Trust Company and Morgan Jones $12,500, out of which was taken a bonus of 10 per cent., and the note representing this loan was held by the Continental Bank & Trust Company, but owned by Fidelity Trust Company and Jones. To secure the payment of the notes executed for the $200,000 Beardsley pledged the 505 railroad bonds referred to above and gave mortgages or deeds of trust practically on all the property owned by him, including the electric light and ice plants erected as originally contemplated. In the summer or early fall of 1907 there had been contracted in the construction of said plants and other improvements desired debts amounting to about $75,000. These debts were for machinery purchased to be used in connection with said plants and for material furnished therefor, etc., and were secured by vendors', mechanics' and materialmen's liens. In addition thereto debts which were unsecured, amounting to about $25,000, had been created. There is testimony tending to show that Beardsley's money at this time had been exhausted, and that, all of his property being covered with liens, he had nothing available as security for a further loan. This being the condition of Beardsley's affairs, the Fidelity Trust Company, as trustee, at his request, brought suit in the district court of Tarrant county, Tex., on the 22d day of November, 1907, and caused a receiver to be appointed and to take charge of all of Beardsley's properties. The lienholders referred to filed interventions in said suit and prayed judgment for the amount of their respective claims and a foreclosure of their liens. The Continental Bank & Trust Company also intervened in said suit, and asked judgment for the full amount, principal and interest, of the $12,500 note held by it. The notes representing the $200,000 loan were declared due because Beardsley suffered liens to be placed upon the property mortgaged to secure them, in violation of the terms of the contract, and on January 11, 1907, the Fidelity Trust Company filed an amended petition in the receivership suit and prayed judgment for the amount of said notes, together with a foreclosure of its liens. When this was done Beardsley employed several lawyers to represent him in defending the Fidelity Trust Company's suit. W. B. Smith, one of the plaintiffs herein, was one of Beardsley's attorneys in the said receivership suit. On the 28th day of November, 1908, J. D. Beardsley assigned in trust to the said W. B. Smith all his right, title, interest, and equities in and to all his propertes located at Mineral Wells, and in and to the said 505 railroad bonds, for the purpose, among others, to secure the payment of the indebtedness of the said Beardsley to his attorneys and to enable the said Smith to enter into an agreement with the said D. T. Bomar and Fidelity Trust Company, trustee, whereby the property rights of the said Beardsley would be conserved. It appears that Beardsley's lawyers' consulted with regard to the defenses they could make in this suit brought by the Fidelity Trust Company against Beardsley, and concluded that usury was the main, if not the only, defense they could make. It seems that they further concluded that the situation with respect to Beardsley's properties was such that they would be lost to him if the liens upon them were foreclosed, whether a plea of usury should be sustained or not, and that it would be to Beardsley's interest if some agreement could be entered into by which the properties could be bought in and Beardsley given an opportunity thereafter to raise money and reacquire the same. Touching the matter, Mr. Cantey, one of Beardsley's attorneys, testified, in substance, that he regarded such a course of more value to Mr. Beardsley than the contemplated plea of usury and necessary to enable him to escape financial ruin.

In accordance with these views, and after much discussion and the reconciliation of certain differences, the Fidelity Trust Company and D. T. Bomar, as parties of the first part, and W. B. Smith for himself and as trustee for Beardsley and other parties represented by him, as parties of the second part, on the 28th day of November, 1908, entered into a contract in writing which recites the pendency of the Fidelity Trust Company's suit against Beardsley, the interventions filed therein, etc., and that said contract was made "for the purpose of com-

promising and settling the controversies and differences arising out of the transactions" therein related. Among other things, the said contract provided that the Fidelity Trust Company, for the benefit of those for whom it sued, should have judgment for the full amount, principal and interest, of the collateral notes of $200,000 sued on with foreclosure of the liens given to secure their payment, and that the intervener, Continental Bank & Trust Company, should have judgment for the full amount, principal and interest, of the $12,500 note sued on by it, less a credit of $80.82, with foreclosure of lien given to secure its payment. The said contract further provided that upon the payment of a sum of money equal to the aggregate of the sums specified therein, on or before the day Beardsley's properties were to be sold under the decrees of foreclosure in the said suit of the Fidelity Trust Company, the judgments rendered therein should be assigned and transferred to W. B. Smith, trustee. It further provided, in effect, that if the said Smith did not pay said sums on or before the date of the sale of said properties, then the said Fidelity Trust Company and D. T. Bomar should bid at the sale thereof, if necessary to become the purchasers thereof, the balance then owing on their respective judgments, together with such liens as they had assumed or guaranteed, or as purchasers of the property would be compelled to pay to other lienholders, and that, if they became the purchasers of said property at said sale, they would cancel and surrender to the said W. B. Smith, trustee, the notes aggregating $21,600, given by Beardsley for the option he had given Bomar and his associates to purchase a half interest in the property owned and the enterprises then being promoted by the said Beardsley, and that the said W. B. Smith, trustee, should then have an option until July 1, 1909, to repurchase the Beardsley properties upon the payment of a sum equal to the aggregate amount of the Fidelity Trust Company's judgments and the sums secured by liens assumed or guaranteed by said company, or which as purchasers they would be compelled to pay.

On December 17, 1908, final judgment was rendered in accordance with the contract of November 28, 1908, and also in favor of such of the interveners in the said suit of Fidelity Trust Company against Beardsley as established their claims and liens on Beardsley's properties, said claims for which liens were foreclosed aggregating about $84,000. The 505 railroad bonds which had been pledged to secure the payment of Beardsley's notes of $21,600 executed in cancellation of the option given Bomar and his associates to purchase a one-half interest in Beardsley's Mineral Wells properties were sold under said pledge prior to the rendition of the judgments mentioned to the Fidelity Trust Company for $75,000. Objection was made to the sale of said bonds for $75,000, and the Fidelity Trust Company, in open court, increased the amount to $100,000, and thereupon judgment was entered in favor of the Fidelity Trust Company, trustee, for the principal, interest, and attorney's fees on the collateral trust notes of $200,000, less a credit of $76,240 allowed out of the proceeds of said bond sale, said judgment bearing interest at the rate of 8 per cent. per annum from its date. Judgment was also entered in favor of intervener, Continental Bank & Trust Company, for $14,195.83, being principal, interest, and attorney's fees due on the note for $12,500 hereinbefore mentioned. The liens given to secure said claims were foreclosed, and the property covered by them ordered sold. By virtue of an order of sale issued on said judgments the entire property upon which the foreclosures were had, W. B. Smith, trustee, having failed to pay off said judgments under the terms of the agreement of November 28, 1908, was sold at public vendue by a commissioner appointed by the court for that purpose, to D. T. Bomar for the sum of $75,000, he being the highest bidder. This sale was reported to the court and confirmed, and on March 8, 1909, a deed was executed by the commissioner joined in by the receivers who had been appointed in said suit, conveying to D. T. Bomar in absolute terms all the properties upon which the liens referred to had been foreclosed. J. D. Beardsley, on the same day, also executed a deed absolute in form conveying all of said properties to D. T. Bomar. On June 18, 1909, an agreement was entered into between D. T. Bomar, acting for himself and associates, and W. B. Smith, trustee, and Ed Cornish and other persons, in which it was agreed that Bomar and his associates should remain in possession of and operate said property. After the purchase of said properties by Bomar, as stated, W. B. Smith, attorney for Beardsley, endeavored to obtain a loan for Beardsley, that he might take advantage of the option given him by the terms of the contract of November 28, 1908, to repurchase said properties at any time prior to July 1, 1909. Smith testified that numerous efforts were made by him to obtain the loan, but without success. On July 23, 1909, the said Bomar executed to S. B. Cantey, also one of Beardsley's attorneys, for the benefit of Beardsley, what is termed by D. T. Bomar to be a new option, which was in October, 1909, amended, by which Beardsley was given the right to repurchase said property at any time before July 10, 1910. By the terms of this last option contract the purchase price was fixed on the basis of the contract of November 28, 1908, together with such further sums as should be expended by Bomar in the operation of the electric light and ice plants, and in the acquisition of what is designated as the Galbraith plant, which, it seems, was then in contemplation. During the existence of the last-mentioned option Bomar acquired the Galbraith plant, furnishing the money

therefor. Beardsley and his attorneys were unable to obtain the money with which to reacquire the properties which Bomar had purchased at the foreclosure sale, and he was therefore unable to take advantage of the option mentioned.

On December 28, 1910, W. B. Smith, trustee, as hereinbefore stated, filed this suit in the district court of Dallas county, Tex., some of the defendants being residents of said county. J. D. Beardsley having died, his executors and heirs were made parties to the suit by an amended petition filed July 7, 1913, and upon this amended petition the case was tried. In the amended petition of plaintiffs it is alleged, in substance, among many other things, that the loan of $200,000 evidenced by the "collateral notes" which were sued on in the suit of Fidelity Trust Company against J. D. Beardsley in the district court of Tarrant county, Tex., and the loan of $12,500, evidenced by the note upon which the intervention of the Continental Bank & Trust Company in said suit was founded, were usurious in their inception, by reason of the verbal agreement entered into between the said J. D. Beardsley and D. T. Bomar and Ed S. Hughes and later put in the form of a written agreement purporting to have been entered into between the said Beardsley and Fidelity Trust Company of date November 5, 1906, by the terms of which said written agreement the said Fidelity Trust Company was to receive $20,-000, for securing said loan of $200,000, and by reason of the option exacted of Beardsley by Bomar and his associates to purchase a half interest in Beardsley's properties at Mineral Wells and the notes of $21,600 given by Beardsley to Bomar in cancellation of such option; that the usury in said loans was not purged either by the contract of November 28, 1908, or by the judgment rendered thereon December 17, 1908, by the district court of Tarrant county in the suit of the Fidelity Trust Company against Beardsley; that said judgment rendered by the district court of Tarrant county in pursuance of said contract of November 28, 1908, and the sale thereunder, at which D. T. Bomar became the purchaser of Beardsley's properties, receiving a deed absolute in form, merely operated, under the facts and circumstances of the transactions of the parties, to constitute the said Bomar a mortgagee in possession; that payments had been made in excess of the principal sums of said loans; and that when said loans were purged of usury the defendant Bomar would be justly indebted to the plaintiffs. The plaintiffs prayed, among other things not necessary to state for the purposes of this appeal, that a receiver be appointed for all the properties involved in the controversy; that an accounting be had; that plaintiffs have judgment for their debts against the heirs and legal representatives of J. D. Beardsley, deceased, and all other defendants; that the loans obtained by Bomar and his associates for J. D. Beardsley be declared usurious; and that a lien in favor of the plaintiffs against the said properties be established and foreclosed as against the defendants D. T. Bomar, Morgan Jones, and others, subject only to the indebtedness justly owing by the heirs and representatives of J. D. Beardsley, deceased, to the defendants, Bomar and his associates, as the same existed on the 1st day of July, 1909, if any he or they should establish. There was no prayer that the judgment rendered in the district court of Tarrant county be set aside. The defendants Bomar and his associates answered, so far as we deem it necessary to state, denying that the loans in question were usurious, and alleging that, if they ever were usurious, the usury had been compromised and settled by the contract of November 28, 1908, and had been adjudicated against Beardsley by the judgment of the district court of Tarrant county, Tex., rendered on December 17, 1908. They further denied that Bomar was a mortgagee in possession or that he held the properties involved in this suit in trust for Beardsley. They alleged that Beardsley had an option to repurchase said properties on the terms set forth in the contract of November 28, 1908, and that Bomar had at all times been willing to permit Beardsley to exercise said option.

The case was tried with the aid of a jury, and when the introduction of the evidence was concluded, the court instructed the jury, in substance, that both the loan of $200,000 and the loan of $12,500 were usurious when made and had never been purged; that in stating the account between the parties appellants should be credited with $180,000 on account of the first loan mentioned and $11,-250 on account of the second, and that no interest should be computed thereon, and that all payments should be credited thereon; that Bomar, acting for himself and his associates, was a mortgagee in possession of the properties involved in this suit; that the agreement by which Bomar, so acting, acquired the "Galbraith plant," was illegal; and that in stating the account between the parties Bomar and his associates were not entitled to credit for any sums of money expended by them in the acquisition of said plant either as purchase money, receiver's fees, attorney's fees or as compensation for purchasing said plant. The jury was further instructed to charge Bomar with the reasonable value of certain street car materials, etc., which he had sold on a credit, while in possession of the Beardsley properties after his purchase at the foreclosure sale. The only issue of fact submitted to the jury was as follows:

"When the account between D. T. Bomar and his associates, on the one part, and the plaintiff and beneficiaries of his trust and the legal representatives, legatees, and heirs of J. D. Beardsley, deceased, on the other part, is stated in accordance with the directions in this charge, in whose favor do you find the balance and what is the amount thereof?" .

In answer to the question so submitted, the jury found as follows:

"We find for plaintiff W. B. Smith, trustee, and the legal representatives of J. D. Beardsley, and in the amount of fifteen thousand ($15,000) dollars."

Judgment was thereupon rendered in favor of appellees for the sum of $15,000, and, the motion of the appellants for a new trial having been overruled, they appealed.

Objections are urged to the consideration of the assignments of error, but we regard them as being at least in substantial compliance with the rules and they will be considered. They are very numerous, and, instead of quoting and treating them in detail, we shall state and discuss the main propositions contended for by appellants. The substance of those propositions is that the charge of the court wherein the jury was instructed, in effect, that in stating the account between the plaintiff, the representatives of the estate of J. D. Beardsley, and the creditors of the said Beardsley, on the one hand, and D. T. Bomar and his associates, on the other hand, they should treat the loan of $200,000 as a loan of only $180,000 and the loan of $12,500 as a loan of only $11,500, and to allow no interest thereon, on the theory that said loan was usurious, but should apply on the principal thereof all payments shown to have been made on said loans by way of interest, etc., and that the legal relation between D. T. Bomar and J. D. Beardsley before his death, and Beardsley's heirs and legal representatives thereafter, became and was, after the purchase of J. D. Beardsley's properties at the foreclosure sale, as to all of said property, a mortgagee in possession, and that the agreement by which Bomar undertook to acquire the Galbraith property was illegal, was erroneous: (1) Because the undisputed evidence disclosed that the $20,000 thereby required to be deducted from said loan was for a bona fide commission, or brokerage, agreed to be paid, and paid by J. D. Beardsley as compensation for services rendered for the said Beardsley in forming the syndicate of persons who took said loan, and not as additional interest charged for the loan, nor as a cloak to cover usury, and it was unimportant that this commission, after being earned, was subsequently divided with some of the lenders; (2) because, if it was not established by the undisputed evidence that said $20,000 was earned by D. T. Bomar and his associates as a commission for services rendered Beardsley in forming said syndicate, then whether or not said sum had been so earned was, under the evidence, an issue of fact for the determination of the jury and not one of law for the decision of the court; (3) because the option given by Beardsley to Bomar and his associates to purchase a one-half interest in the said Beardsley's properties at Mineral Wells at their cost with interest added, and which was carried into the collateral trust agreement of November 15, 1906, and subsequently canceled or released in consideration of J. D. Beardsley's two notes aggregating $21,600, did not render the loan of $200,000 usurious, or, if it did, said amount was eliminated by the compromise agreement of November 28, 1908, and the transaction thereby purged of that element of usury; (4) because whether said option was given for the use of the money loaned was a question of fact, under the evidence, for the jury, and not an issue of law for the court; (5) because, even if the loan of $200,000 was originally usurious, the usury was eliminated and purged therefrom by the contract of November 28, 1908, or, if not so purged as a matter of law, the terms of said contract, together with the facts and circumstances under which it was executed, as shown by the evidence, would have justified a finding that it was waived and purged by said contract; (6) because the court assumed in his charge that said loan of $200,000 had never been purged of usury, when the evidence showed or was sufficient to show that any contention or right on the part of J. D. Beardsley, or those claiming under him, to have said loan held to be usurious, was fully adjudicated and determined against such contention or right by the judgment of the district court of Tarrant county rendered in the suit of Fidelity Trust Company, trustee, against said Beardsley on the 17th day of December, 1908; (7) because there were issues of fact presented by the evidence upon which the jury could have properly made findings that would have shown that the usury, if any ever existed in said $200,000 loan, had been purged and waived; (8) because the undisputed evidence showed that the right to plead usury to the loan of $12,500 evidenced by Beardsley's note payable to the Continental Bank & Trust Company was, upon a valuable consideration, waived and settled by the contract of November 28, 1908, and besides had been adjudicated against appellees by the judgment of the district court of Tarrant county in the suit of Fidelity Trust Company, trustee, against Beardsley; (9) because the agreement by which the Galbraith plant was acquired was not in violation of any provision of the anti-trust laws of this state or otherwise illegal; (10) because, under the facts and circumstances of the case, the trial court was not authorized to charge as a matter of law that D. T. Bomar was a mortgagee in possession of all the properties involved in this controversy.

[1] The trial court held, as will be seen by the charge complained of, that the evidence adduced not only failed to show that said loan was not usurious, but conclusively established that it was usurious. In neither of these views do we concur. Whether said loan was or was not usurious became and was under the evidence, in our opinion, an issue of fact for the determination of the jury. The position assumed by the appellees, as has been seen, is that the loan of $200,000

was rendered usurious by reason of the exaction by D. T. Bomar and his associates of the $20,000 deducted from said loan, and the option demanded to purchase a one-half interest in Beardsley's properties at Mineral Wells, which option was later released in consideration of Beardsley's notes aggregating $21,600. The contention is that said $20,-000 and said option were demanded and received as interest or compensation for the loan and use of the said $200,000 borrowed by Beardsley, and not, as is contended by appellants, as a commission agreed to be paid and paid by Beardsley as compensation for personal services rendered by D. T. Bomar and Ed S. Hughes in securing said loan or in forming the syndicate of persons who took it. If it cannot be said that the evidence presented these matters as issues of fact sharply drawn, it was clearly of such a character as called for the submission of them for the jury's decision. On the subject of whether the $20,000 deducted from the $200,-000 loan was a commission charged for services in obtaining said loan for J. D. Beardsley or whether it was an additional charge as interest for the use of the money loaned, D. T. Bomar testified, in substance, that in the early part of October, 1906, he and Ed S. Hughes by accident, and not by design, met Beardsley in the passenger station of the Texas & Pacific Railway Company at Dallas, Tex.; that Maj. Beardsley came in and talked to them and said, "Gentlemen, do you know where I can borrow $200,000 on very good security for a legitimate enterprise; I am willing to pay 6 per cent. interest on it, and will pay a brokerage of 10 per cent.?" that Mr. Hughes asked him (Bomar) what he thought about it, and that he replied that, if the security was sufficient and the rate of interest was increased to 8 per. cent. he thought upon that basis the money could be raised; that Maj. Beardsley explained the security he wanted to put up, and as a result of what had passed he (Bomar) and Hughes agreed to see what they could do towards obtaining the loan Beardsley desired. Bomar further testified, in substance, that within a very short time after the meeting with Beardsley at Dallas he came to Dallas, saw J. B. Wilson, a man of large means, and discussed the matter fully with him; that 505 bonds of the Louisiana & Northwestern Railroad Company of the denomination of $1,000 each, a part of. the security offered by Beardsley for the loan, were incumbered, 100 of them being held by a man named Hunter, to secure the payment of certain indebtedness against said railroad, and the remaining 405 of said bonds having been attached in the city of St. Louis, upon a claim for damages against Beardsley for $100,000; that the effect of this lawsuit was discussed, and Beardsley suggested that he (Bomar) go to St. Louis and investigate the matter; that he went to St. Louis, and there met W. B. Smith, one of the appellees in this case, and who was then Beardsley's attorney, and received from him such data and information as he could furnish, and made the best investigation he could of the value of said bonds and the character of said lawsuit, with the view of determining what the outcome would probably be; that he spent two days in St. Louis making this investigation, and thereafter made a written report of his discoveries and conclusions to J. B. Wilson, of Dallas, Tex., and Morgan Jones, of Seymour, Tex., who had been solicited to make the loan Beardsley desired. This report is found in the record. It is in the form of a letter addressed to the . said Wilson and Jones and covers about five pages of the statement of facts. In this report Bomar wrote:

"Maj. Beardsley and Mr. Smith [Beardsley's attorney] want to know at an early date whether or not the transaction will be further considered by you gentlemen, and I have agreed to advise them just as early as possible, say Monday or Tuesday of next week. I expect to be at home not later than Sunday of this week, and if you desire to go further with the transaction, please advise me at Ft. Worth as to what I shall say to these gentlemen."

Bomar further said that within a few days after that report or letter was written J. B. Wilson and Morgan Jones met at his office in Ft. Worth, and, after discussing the matter, declined to make any part of the loan. There is further testimony in the record to the effect that Bomar and Hughes were engaged for about one month endeavoring to find persons who would make the loan of $200,000; that during that time quite a correspondence was had between Bomar, Beardsley, and Smith in regard to the matter and that a number of persons were approached by both Bomar and Hughes, many of whom declined to participate in the loan; that as a final result of Bomar's and Hughes' efforts persons were found who agreed to make the loan and the syndicate, already referred to, formed for that purpose. There is also testimony to the effect that, when the persons were found who were willing to make the loan of $200,000 to Beardsley, it was agreed between them that Bomar, Hughes, and Jones were to participate in the benefits flowing from said loan, and that the $20,000 deducted therefrom should be divided between them; that the collateral trust agreement made no mention of the $20,000 which Bomar says Beardsley agreed to pay for his services in securing the loan, but that a written contract to that effect was attached to said agreement. Bomar testified that the contract for the commissions of $20,000 was not mentioned in the collateral trust agreement because he feared it might interfere with making sales of the notes to be executed by Beardsley for the $200,000 loan. J. D. Beardsley did not deny that Bomar was to get 10 per cent. of the $200,000. He testified that in November, 1906, Bomar advised him that he thought he could make the desired loan; that his terms were for the loan to

run a little over two years, or until December 31, 1908, to bear interest at the rate of 8 per cent. from the time the notes were disposed of; and that he (Beardsley) was to pay him "a bonus of 10 per cent. on the loan." He further said:

"Mr. Bomar did arrange a loan of $200,000, and I made my agreement with him. I got $180,000. After the agreement, the collateral agreement, was made and signed, Mr. Bomar presented me with the second agreement he had exhibited here (the agreement for the $20,000). I asked him why he made that agreement, and he said he had made it to protect himself from the charge of usury. There was no brokerage in my contract with Mr. Bomar; it was a straight contract to borrow the money and not pay 10 per cent. premium and interest at 8 per cent. The contract presented as fixed to the collateral contract was made afterwards, and he gave me that as his reason to make it, and I had agreed to pay the option, the bonus I mean, and I readily signed it."

The foregoing and other testimony in the record clearly justifies the conclusion that whether the $20,000 deducted from the $200,000 loan was paid and received as a bona fide commission or brokerage for services rendered Beardsley in procuring for him persons who were willing to lend the money he desired or as interest, in addition to that stipulated in the collateral trust notes, for the use of the money loaned, was an issue of fact, and not an issue of law. And the failure of the court to submit this issue is not an immaterial error, because of the contract of November 28, 1908, or the judgment rendered in accordance therewith in the district court of Tarrant county, or because some or all of the makers of the loan of $200,000 to Beardsley received a part of said $20,000. This is true for the reason that neither the execution of said contract, nor the rendition of said judgment, nor the division of said $20,000 among the makers of said loan, when considered in connection with all the evidence in the case, shows conclusively that said sum was agreed to be paid or paid as interest for the use of the money loaned. It seems to be well settled that, where the third party who negotiated the loan of money was not the agent of the lender, the transaction is not usurious, although such party received from the borrower in payment for his services in securing the loan, a commission in addition to the highest legal rate of interest charged for the use of the money. Stuart v. Tenison Bros. Saddlery Co., 21 Tex. Civ. App. 530, 53 S. W. 83; Eslava v. Crampton, 61 Ala. 507; Grieser v. Hall, 56 Minn. 155, 57 N. W. 462. It has been held, however, that if the party who negotiated the loan was the agent of the lender, and, with the knowledge of the lender, received from the borrower the commission, the transaction will be regarded as usurious. Texas Loan Agency v. Hunter, 13 Tex. Civ. App. 402, 35 S. W. 399; Payne v. Newcomb, 100 Ill. 611, 39 Am. Rep. 69. In the case of Williams v. Bryan, 68 Tex. 593, 5 S. W. 401, however, the Supreme Court of this state, speaking of the last rule

mentioned, said that whether "a payment by the borrower to the agent of the lender of a fair compensation for his services in effecting the loan, though with the knowledge and consent of the latter, should in any case be held to make the contract usurious, may be doubted," and in Acheson v. Chase, 28 Minn. 211, 9 N. W. 734, it was expressly held that it did not. The testimony is sufficient to show that D. T. Bomar and Ed S. Hughes, who negotiated the loan in question, were Beardsley's agents, and if he, the borrower, agreed to pay them 10 per cent. of the amount of the loan as a commission for their services in finding and inducing persons to make the loan, and not as interest for the use of the money, the proposition of appellants that Bomar and Hughes, when such commission was earned, could do as they pleased with it, and that the division of it among the persons making the loan of $200,000 to Beardsley would not taint the transaction with usury, is not without authority to support it. Dickey v. Brown, 56 Iowa, 426, 9 N. W. 347. In such case the money paid to the lender is the money of the agent, and not the money of the borrower. There is testimony in the case tending to show that Bomar and Hughes were engaged at least a month after Beardsley contracted to pay them the commission claimed, before they succeeded in consummating the loan, and we have found no testimony in the record that tends to show that Bomar or Hughes at the time said contract was made intended to divide said commission with the makers of the loan, with the knowledge of Beardsley. We do not understand that the acceptance by the lender from the broker of a portion of his commission, which, together with the interest charged in the note or written obligation evidencing the loan, exceeds the legal rate of interest allowed, ipso facto constitutes usury. In Grieser v. Hall, supra, the court said that the only question presented is whether the evidence was sufficient to justify the finding of the court that the note involved in the suit was usurious, and, in discussing the evidence, remarked:

"We think the court may well have found that Mrs. King supposed that Warner was plaintiffs' agent to secure the loan, and not her agent in making it, and that as such he was entitled from them to a commission, of which he voluntarily gave her the benefit. This version of the transaction, which was justified by Mrs. King's testimony, was entirely consistent with the conclusion that there was no intention on her part to take or contract for more than the legal rate of interest for the use of the money loaned, which is always an essential constituent of usury."

In Henry v. Sanson, 2 Tex. Civ. App. 150, 21 S. W. 69, the Court of Civil Appeals for the Second District of this state said:

"It has been held 'that in construing the usury laws the uniform construction in England has been—and it is equally applicable here—that to constitute usury within the prohibitions of the law there must be an intention knowingly to contract for or to take usurious interest' "—citing Call v. Palmer, 116 U. S. 98, 6 Sup. Ct. 301, 29 L. Ed. 559; Jones v. Berryhill, 25 Iowa, 289.

The same doctrine seems to be announced in the case of Wheaton v. Voorhis et al., 53 How. Prac. (N. Y.) 319. That J. D. Beardsley had the legal right to employ agents to negotiate for him the loan he desired and agree to pay and pay them a commission for their services can hardly be questioned; and we are of opinion that it cannot be said as a matter of law, under the evidence adduced in this case, that the lenders of the money to Beardsley accepted from his agents such portions of the alleged commission shown to have been received by them for the purpose of evading the usury law of this state. Of course, if the contract when originally made to pay what appellants call a commission for services performed by Bomar and Hughes in securing the loan for Beardsley was a mere sham or device to cover usury, the money received by them as such commission was the money of the borrower, Beardsley, and was in effect paid by him to the lenders for the use of the money loaned and rendered such loan usurious. That question was not submitted to the jury, and the fact that the evidence may have clearly authorized an affirmative finding upon it did not justify the court in withdrawing the issue from them upon the theory that it became and was an issue of law.

[2, 3] But appellants contend, as has been seen, that even though the loan of $200,000 was originally usurious for the reasons insisted upon by the appellees, the usury was purged by the compromise agreement of November 28, 1908, and the judgment entered in conformity therewith by the district court of Tarrant county. On the other hand, the appellees contend that said contract and judgment conclusively establishes the fact that the judgment based upon the contract was contrived and taken as a cloak for usury. If said contract and judgment had the effect, as thus contended for by the appellants, the failure of the trial court to submit to the jury the issues discussed above furnished no ground for a reversal of the case. We have reached the conclusion, however, that if the loan of $200,000 was usurious in its inception, then whether the usury was eliminated by the contract and judgment mentioned, or whether they constituted a mere device to conceal such usury, was under the evidence an issue of fact. Neither of them considered separately, nor both considered together, can, in our opinion, be regarded as conclusively establishing either that the usury claimed was thereby purged, or that the one was entered into and the other taken as a cloak to cover usury. That honest compromises and settlements of matters in dispute are favored, and that a contract which is usurious may be purged by a subsequent agreement of the parties to it, find unequivocal recognition in decisions of our Supreme Court. Gilliam v. Alford, 69 Tex. 271, 6 S. W. 757; Building Co. v. Jones, 94 Tex. 497, 62 S. W. 741; Stout v.

Bank, 69 Tex. 384, 8 S. W. 808; Whitlow v. Culwell, 16 Tex. Civ. App. 266, 40 S. W. 642. The item of $20,000 which appellants claim D. T. Bomar and Ed S. Hughes were to receive from J. D. Beardsley as commissions for their services in obtaining the loan of $200,000, and which appellees insist rendered the transaction usurious, was carried into the contract of November 28, 1908, but appellants contend that the case is distinguishable from those cases cited by appellees, in which it appears to have been held that, if any part of the usurious interest charged in the original contract is carried into the new, the contract will not be regarded as having been purged of its original vice, upon the ground that a new consideration entered into the new contract involved in the case at bar which was not present in the new contract relied on in the cases cited. The position assumed by the appellants is, in effect, that Beardsley and his attorneys regarded the benefits to accrue to Beardsley as a result of the compromise agreement of November 28, 1908, of greater value than an elimination of the particular item of $20,000 or a successful interposition of the contemplated defensive plea of usury in the Tarrant county suit, and that as a matter of fact there were considerations yielded to Beardsley by virtue of said compromise agreement which exceeded in value the amount of said item and which were sufficient to offset the same; that, this being true, the same principle or rule of law applies as would apply had said item been actually eliminated. The claim that Beardsley and his advisers believed that the new consideration carried into the contract of November 28, 1908, would be of greater pecuniary advantage to Beardsley than an elimination of the item of $20,000 or a successful interposition of the plea of usury in the Tarrant county suit, and that in view of that belief the contract of November 28, 1908, was executed without an actual elimination of the item of $20,000, is not without evidence to support it. And the contention that, if the value of the considerations yielded to Beardsley by said contract exceeded the amount of said item, or was equal thereto and sufficient to offset the same, the same rule of law applies to the transaction as would apply had the item itself been eliminated, seems to be sustained by authority. Section 482 of Mr. Webb's work on Usury, wherein he treats of the right of parties to a usurious contract to purge it of the usury by a new contract, contains the following:

"As said by an accurate legal writer on the subject: 'It is not essential that the amount of the usury paid should actually be returned to the debtor; it is sufficient if he receives a valuable and bona fide consideration for the settlement and release of the usury; as where the debtor, in the payment of an usurious debt, conveys property to the creditor at a price greatly exceeding its real value in consideration of releasing the usury.'"

The case of Blohm v. Hannan, 82 N. J. Eq. 192, 88 Atl. 622, cited by appellants, is, it oc-

curs to us, very much in point. In that case Klipper, having a first mortgage on the defendants' land for $6,950, which defendants claimed was tainted with usury, surrendered his mortgage for $6,000 cash and a second mortgage for $1,500, permitting defendants to place a first mortgage on the property for $18,000; and the court held that this was a bona fide arrangement; that by it a settlement of the usurious transaction had been accomplished and a new consideration made between the parties, and was not affected by any usury involved in the first transaction. The precise question does not seem to have been decided by any appellate court of this state, but we think the tenor of our decision indicates that, in order for a usurious contract to be purged of its usury by a new contract into which a new consideration has entered, the value of such consideration must be equal to the full amount of the usury. The view of appellants is that the considerations yielded to Beardsley by virtue of the contract of November 28, 1908, were conclusively shown to be of greater value to him than a successful plea of usury in the Tarrant county suit would have been, or of value exceeding or equal to said item of $20,000 and sufficient to offset the same, and thereby eliminate all such usury as may have been in the original contract. To this view we are not prepared to subscribe. By said contract, or the imported new considerations, new or additional obligations were imposed upon and assumed by Beardsley, and the value of such obligations to Bomar and his associates or the cost and expense to be incurred thereby on the part of Beardsley was not definitely shown. Besides, the value and amount of the different items constituting the new considerations which it is claimed entered into said contract, or at least some of them, were not indisputably established. Neither the value of the option given by Beardsley to Bomar or the Fidelity Trust Company to purchase a one-half interest in the Beardsley properties at Mineral Wells, nor the value of said properties, nor the value of the two notes aggregating $21,600, subsequently executed by Beardsley for a release of said option, and which by the terms of the contract of November 28, 1908, were to be canceled and returned to Beardsley, appears to have been proved, and it seems to be well settled that a court cannot assume and hold as a matter of law that a note is worth its face value. That is a question of fact. Brightman v. Reeves, 21 Tex. 70; Thompkins v. Perry et al., 61 Tex. Civ. App. 183, 128 S. W. 1164; First Nat. Bank v. Dickson, 5 Dak. 286, 40 N. W. 351; Booth v. Powers, 56 N. Y. 22; Zeigler v. Wells, 23 Cal. 179, 83 Am. Dec. 87; McPeters v. Phillips, 46 Ala. 496. Without proof of the value of said option or the value of said notes at the time said compromise agreement was entered into, the pecuniary benefit to accrue to Beardsley thereby or the extent to which the cancellation and extinguishment of said notes may have served to purge the original contract of the alleged usury cannot be known. Another element of new consideration which appellants claim entered into the contract of November 28, 1908, is $10,000 of the attorney's fees stipulated in the collateral trust notes, which was remitted by Bomar and the Fidelity Trust Company. The appellees insist that it is questionable whether Bomar or the Fidelity Trust Company were in any event entitled to any attorney's fees—

"because Bomar was his own lawyer, and whilst the suit in Tarrant county, was brought in the name of the Fidelity Trust Company, of which Bomar was president, yet it obviously was for the use and benefit of the Bomar syndicate, notwithstanding which by the renewal contract [the contract of November 28, 1908], Bomar was allowed $8,000, with interest at 10 per cent. per annum from April 1, 1909, as attorney's fees. Bomar therefore, instead of conceding anything, exacted $8,000, when it was questionable whether he was entitled to or could recover anything" as such fees.

This contention is not without force. There is at least some doubt, under the facts disclosed by the record, as to whether or not this item should be regarded as an element of new consideration which entered into said contract. Likewise it cannot be said, we believe, as a matter of law arising upon the undisputed facts, that there was saved to Beardsley, by the contract of November 28, 1908, at least the sum of $13,724.91, as is contended by appellants. Whether such an amount was saved to Beardsley as a result of said contract was, we think, a question of fact. This is probably true with respect to some of the other items which appellants insist entered into said contract as elements of the new consideration therefor.

[4-7] Nor do we think it can be said as a matter of law arising upon the undisputed evidence that, if the original contract entered into between Beardsley and D. T. Bomar and Ed S. Hughes, whereby the former agreed to pay the latter $20,000 for negotiating the loan of $200,000, was usurious, all contention or right on the part of Beardsley and his heirs and legal representatives to have the notes evidencing such loan held to be usurious was fully adjudicated and determined against such claim and contention by the judgment of the district court of Tarrant county, and the right of the appellees to plead such usury in this suit thereby precluded. The contention of the appellees is, in effect, that the undisputed evidence shows that said judgment on the $200,000 notes was suffered as collateral security, which together with the foreclosure of the liens given by Beardsley to secure the payment of said notes, was intended to operate and did operate simply as a change in the form of the securities of Bomar and his associates, and, like other obligations given as collateral, enforceable only to the same extent as the principal debt. The judgment was entered in pursuance of the contract of

November 28, 1908, and if it was suffered and taken merely for the purpose claimed by appellees, the law is that it can be enforced only to the same extent as the principal debt could be. We do not concur, however, in the view that the undisputed evidence discloses that such was the purpose and intent of the parties in having said judgment rendered. As before indicated, whether it was intended by the parties that said judgment should operate as a mere change in the form of the securities of Bomar and his associates, and to constitute Bomar a mortgagee in possession, or a full and final adjudication of all the rights of the parties incident to or involved in the suit in which it was rendered, or whether the sale and purchase of Beardsley's properties under said judgment by Bomar were intended to pass the absolute title of said properties, were, under the evidence bearing upon the subject, issues of fact. The contract of November 28, 1908, and the judgment rendered in pursuance thereof, purport to have been entered into and taken, respectively, for the purpose of defining, settling, and adjudicating finally the rights of the parties with respect to all the matters actually or incidentally involved in the suit of Fidelity Trust Company v. Beardsley, then pending in the district court of Tarrant county, with simply an option granted Beardsley to pay off and satisfy said judgment before the properties upon which the liens therein foreclosed were sold or to reacquire said properties after such sale within a certain time and upon a stated consideration. But the evidence, when considered as a whole, raised issues of fact as to whether such was the real purpose of said contract and judgment, or whether said judgment was intended as a mere change in the form of the securities of Bomar and his associates, with the relation of creditor and debtor still existing. There is evidence to the effect, as contended by counsel for appellees, that Beardsley's affairs were in such condition that it was considered best by both parties to have a receiver appointed to preserve the status quo, hence the consent and cooperation of both parties in the matter of the institution of the suit; that during the pendency of the suit antagonism arose between the parties, and on November 28, 1908, it was compromised by the renewal contract of that date, and thereafter, on December 17, 1908, judgment was rendered in pursuance of that contract; that the agreement of November 28, 1908, stipulated the various sums to be paid by Beardsley, and covenanted that, upon such payment being made, Bomar would convey to Beardsley all the properties described in the contract, and further provided that Beardsley should have the right to mortgage or sell the property to raise the money to make the payments required of him; that he should have the right to sell or pledge the 505 railroad bonds, conditioned

that the amount he should receive from such sale or pledge should "be applied as a credit upon the amount" Beardsley was required to pay "in order to secure the transfer and conveyance of" his property; that said contract extended Beardsley's indebtedness to July 1, 1909, whereas the judgment was rendered on December 17, 1908, and the purchase by Bomar thereunder was confirmed on March 8, 1909. On July 1, 1909, with Bomar's consent, Beardsley sold the bonds to Hunter for $235,000, $35,000 of which was paid cash, $10,000 of which went to C. H. Beardsley, and the other $25,000 "was paid to D. T. Bomar on account of Major Beardsley's indebtedness." Hunter executed his interest-bearing note to Bomar for the other $200,000 secured by a pledge of 500 of the bonds, which Bomar accepted only as collateral to Beardsley's indebtedness. Bomar rendered various statements of account to Beardsley subsequent to the rendition of said judgment and Bomar's purchase thereunder, ignoring apparently the existence of the judgment and the fact of the purchase. That a judgment of a court of competent jurisdiction is ordinarily conclusive, not only as to the subject-matter determined, but as to every other matter which the parties might have litigated in the case and had decided, is well established by decisions of this state. Nichols v. Dibrell, 61 Tex. 539; Freeman v. McAninch, 87 Tex. 132, 27 S. W. 97, 47 Am. St. Rep. 79; Thompson v. Lester, 75 Tex. 521, 14 S. W. 20. As to the defense of usury, it is the law of this state by statute and adjudicated cases that a defendant who wishes to avail himself of such defense must interpose it in the suit by a special plea under oath. Vernon's Sayles' Civil Statute, art. 4983; Martin Brown Co. v. Perrill, 77 Tex. 199, 13 S. W. 975; Rogers v. O'Barr & Dinwiddie, 81 S. W. 750. These principles are urged here in support of appellants' contention that the judgment of the district court of Tarrant county, which has never been set aside or appealed from, estops the appellees from asserting and pleading in this suit that usurious interest was exacted and taken from Beardsley for the loan of $200,000, but they cannot be applied and enforced on this appeal, for the reason that appellants' right to invoke them depends upon the determination of the issue of fact to which we have just alluded, and which was not, but should have been, submitted to the jury in their favor. If the loan in question was originally usurious and the usury purged or eliminated by reason of new considerations yielded by Bomar and his associates having entered into the contract of November 28, 1908, the effect of said judgment upon the issue of usury is immaterial. If, however, the usury was not so eliminated, and said judgment was entered for the purpose of accomplishing a mere change in the form of the securities of Bomar and his associates, as is contended by the appellees, it did not

have the effect to finally adjudicate the question of usury against appellees and preclude them from pleading the same in this suit. On the other hand, if the suit in which said judgment was rendered was a hostile suit, and said judgment was taken as a full and final adjudication and settlement of all the rights of the parties incident to or involved therein, then and in that event, since Beardsley had an opportunity to plead usury in that suit, and failed to do so, the judgment did have the effect to adjudicate and determine that question against appellees and to preclude them from pleading it herein and insisting upon any right or benefit which otherwise might have been available to them by reason thereof. Aside from our statute cited above, which requires a party who desires to avail himself of the defense of usury to plead it under oath, the general rule in regard to the subject of res adjudicata is well expressed in the following language quoted with approval in the case of Freeman v. McAninch, supra:

"'A party cannot relitigate matters which he might have interposed, but failed to do, in a prior action between the same parties, or their privies, in reference to the same subject-matter.' And if one of the parties failed to introduce matters for the consideration of the court that he might have done, he will be presumed to have waived his right to do so. [Hackworth v. Zollars] 30 Iowa, 433; [Hites v. Irvine] 13 Ohio St. 283; [Le Guen v. Gouverneur] 1 Johns. Cas. [N. Y.] 436; [Gray v. Dougherty] 25 Cal. 266."

The adjudicated cases are not entirely harmonious upon the question, but we believe the weight of authority is to the effect that, if a judgment is suffered and taken "in a hostile suit in which the defense of usury was either overruled, or omitted to be interposed," such judgment is conclusive, and cannot ordinarily be attacked in a subsequent proceeding on the ground that the contract upon which the judgment was rendered was tainted with usury. But that judgments confessed at the time of the making of the usurious loan or upon warrants of attorney given at such time may thereafter be attacked on the ground that the contract upon which such judgments were confessed were usurious is also, it seems, established by the great weight of authority. In such a case the same reason exists for setting aside or holding the judgment for naught as there was for setting aside or annulling the contract to the extent of the usury; that is, that the judgment was a mere device to evade the penalty of usury. It does not appear, however, in the case before us that there was an agreement at the time the alleged usurious loan was made that judgment should be confessed on the notes evidencing such loan. The judgment in question was entered, as has been seen, in pursuance of the contract of November 28, 1908, which was entered into about two years after the loan of $200,000 was made, and appellants insist that the undisputed evidence shows that the suit in which said judgment was rendered was an adversary proceeding, and therefore the judgment was, as a matter of law, res adjudicata of the defense of usury which might have been pleaded in that suit. We are not prepared to say that it conclusively appears that such was the character of the suit in which said judgment was rendered. It was, as indisputably appears, originally instituted by consent of parties and as a friendly proceeding to accomplish the purposes of all concerned. Some differences later arose, but they were adjusted, and the agreement of November 28, 1908, entered into and judgment rendered by confession or consent of all parties. The various facts and circumstances in evidence, which may be considered as giving character to the suit and in determining whether or not it was a real adversary proceeding, will not be given in greater detail than they have already been stated in this opinion. They are sufficient, we think, to raise an issue as to the nature and character of the suit.

[8] The loan of $12,500 was clearly usurious in its inception, but whether it was purged of its usury by reason of new considerations entering into the agreement of November 28, 1908, or concluded by the judgment of the district court of Tarrant county, depends, like the loan of $200,000 in those respects, upon issues of fact which were improperly withdrawn from the jury by the court's charge, and the trial court erred in holding, as a matter of law, that it was not so purged or concluded.

[9, 10] We are also of the opinion that whether Mrs. Mattie Broad, D. B. Keeler, Mrs. S. J. Roth, and Miss Douglass Bomar, who assisted in making the loan of $200,000 to J. D. Beardsley, as shown in the former part of this opinion, received any portion of the $20,000 paid to Bomar and Ed. S. Hughes for negotiating said loan, was, under the evidence, a question of fact. But if it should be found that the loan of $200,000 was usurious because of the payment of said sum, and that its usury was not purged or eliminated by the contract of November 28, 1908, nor concluded by the judgment rendered in pursuance thereof, then, since it is undisputed that the full amount of $20,000 was deducted from said loan and received by Bomar and his associates, the fact, if it is a fact, that said parties did not get any part of said sum, could not, it occurs to us, change the legal result which must necessarily follow such findings.

[11, 12] In reference to the question whether or not the option given Bomar and his associates by J. D. Beardsley to purchase a one-half interest in the Mineral Wells properties and its subsequent release in consideration of Beardsley's notes aggregating $21,600 rendered the loan of $200,000 usurious, we have to say that, if said transaction rendered the loan of $200,000 usurious, the ef-

fect of the contract of November 28, 1908, and the evidence in connection therewith was to discharge and extinguish said notes of $21,600 and eliminate that item of usury from said loan. The contract of November 28, 1908, provided that, if W. B. Smith, trustee for Beardsley, did not pay to the Fidelity Trust Company and D. T. Bomar the amount set out in clause 1 of said contract on or before the date of sale of Beardsley's property under the judgment of the district court of Tarrant county, and that if said company and Bomar became the purchasers of said property at said sale, they would not only satisfy in full all the judgment rendered under the terms of said contract, but would cancel and surrender to W. B. Smith, trustee, the $21,600 notes. If the notes have not been actually surrendered, as appellees contend, that fact does not seriously affect the question. D. T. Bomar became the purchaser of the Beardsley properties under the foreclosure sale referred to, and, the contingency upon which said notes were to be canceled having thereby occurred, their cancellation and extinguishment followed under the terms of the contract as a matter of law. But if we are mistaken in the foregoing views upon this phase of the case, then we think it must be said that the question was one of fact for the jury. It is undisputed that the option was given and released in consideration of the $21,600 notes, and that both Ed S. Hughes and Morgan Jones, being impressed with the idea that real estate in Mineral Wells was going to materially enhance in value, demanded the option, and Hughes said that, if he could not share in that enhanced value, he would not undertake to place any of the notes to be given by Beardsley for the loan of $200,000, but the contract of November 15, 1906, by which the option was acquired purports to convey or grant it to the Fidelity Trust Company in consideration of $10 cash paid, and other valuable considerations, and required the company to pay for the privilege of purchasing a one-half undivided interest in the properties the net cost thereof plus the interest on such cost at 8 per cent. per annum. Whether, under the facts stated and the other testimony bearing upon the question, the purpose in demanding and accepting the option was to obtain the value thereof in addition to the rate of interest charged for the use of the money loaned to Beardsley or as a contemplated profitable investment, was an issue of fact, and not an issue of law for the decision of the court.

[13] This brings us to the consideration of appellants' proposition that the agreement by which the Galbraith plant was acquired was not in violation of any provision of the antitrust law of this state or otherwise illegal. As has been noted, the trial court instructed the jury that the agreement by which the Galbraith plant was acquired was illegal,

and in stating the account between the parties not to allow to D. T. Bomar and his associates credit for any sums of money expended by them in the acquisition of said plant, either as purchase money, receiver's fees, attorney's fees, or as compensation for purchasing said plant. Appellants contend that this instruction of the court was without evidence to authorize it, and that by it they were deprived of items of credit which should have been considered by the jury in arriving at the status of the account between themselves and the appellees, amounting, including interest, to $44,937.88. The Galbraith plant was in operation from some time prior to the erection of the Beardsley plants, and, like the Beardsley plant, was constructed for the purpose of supplying the community with electric lights and ice. Bomar testified that it was a competitive plant in the city of Mineral Wells. Beardsley's plant was shut down in December, 1907. As to what was necessary to make the Beardsley plant a success was discussed by Bomar, Beardsley, W. B. Smith, and S. P. Cantey, Smith and Cantey being attorneys for Beardsley, and Smith, in addition thereto, being a trustee for Beardsley and others interested in Beardsley's affairs. The conclusion was reached that "one of the strong things necessary to be done was to eliminate from the situation the other plant" (the Galbraith plant), and that it could be bought for $50,000. Bomar testified that Smith, Cantey, and Beardsley wanted him to buy the Galbraith plant for $50,000, and increase the option given to Beardsley to repurchase his property, which had been sold under the judgment rendered in the district court of Tarrant county by that amount, and add the Galbraith plant to the Beardsley properties, but that this was not done. He further testified without contradiction that after this, and not very long prior to July 1, 1909, he bought from the First State Bank & Trust Company of Mineral Wells on his own accord $22,500 of lien notes against the Galbraith plant, taking them in the name of L. L. Hawes, and paying in cash $5,000, and executing to said bank notes in the name of the said Hawes and guaranteed by him (Bomar) for $17,500 that in order to induce him to get the Galbraith plant out of the way he was to have the right to put in against Beardsley all the claims that he could against that plant at the full amount that he paid for them, with interest, and also to receive $5,000 for bringing about that result. He said:

"I was not under any obligation to the Beardsley estate to buy that plant. The contract was that for my services in getting the Galbraith plant silenced I was to be paid $5,000, and they were to repay me the $22,500 that I had put into the plant. The First National Bank of Mineral Wells owned a large part of the indebtedness against the plant. I never did take that up, as there was no good purpose in taking that up. It was the desire of these gentlemen and' the primary and fundamental purpose of the whole transaction to get the Galbraith plant,

out of the way so that we could control the ice and electric light business in Mineral Wells."

S. B. Cantey testified that W. B. Smith wanted him to secure the Galbraith plant in some manner, that he wanted him to get Bomar to secure it at $50,000, but that they finally got it on the basis of $22,500. Bomar and the First National Bank of Mineral Wells joined in a suit on the notes held by them respectively against Galbraith and prayed for a foreclosure of their respective liens and for the appointment of a receiver to take charge of the plant. In accordance with this prayer a receiver for the Galbraith plant was appointed, and said plant shut down on the 16th day of October, 1909, by order of the district court of Palo Pinto county. Judgment with foreclosure of the liens was obtained in this suit against Galbraith, and the Galbraith plant subsequently sold thereunder, and bought in by D. T. Bomar. After the purchase by Bomar the machinery and property comprising the plants were divided between Bomar and the First National Bank of Mineral Wells, "in the proportion to the liens each one held that were foreclosed against it." The foregoing is, in substance, the material testimony in relation to the question under consideration, or such of it as is necessary to an understanding of our decision of it. The appellees' counsel have favored us with a very able discussion of the question, together with an exhaustive citation and review of the authorities. We have carefully considered the treatment of the subject, but the length to which this already very long opinion would be extended thereby forbids a review of the many cases cited in support of their conclusion that the trial court's charge in question was correct. Our conclusion is that Bomar's acquisition of the Galbraith plant in the manner shown by the practically undisputed testimony was not a violation of the anti-trust laws of this state. The purchase of the notes against Galbraith, followed by a foreclosure of the liens given to secure their payment upon the Galbraith plant and a purchase of the plant by Bomar at the foreclosure sale, notwithstanding it was his purpose and the purpose of Beardsley and others acting with him to get the Galbraith plant out of the way so they could control the ice and electric light business in Mineral Wells, was not in contravention of any provision of our anti-trust laws, as we understand the construction of those laws by the Supreme Court of this state. It was perfectly lawful for Bomar to purchase the notes, to foreclose the liens given to secure their payment in a court of competent jurisdiction, and to buy in the property at a sale made under such foreclosure, and that all this was calculated to and did result in the elimination of the Galbraith plant from the field of competition, as Bomar and those associated with him may have desired, did not render the proceedings illegal. If the case can be regarded as similar to any decided by the appellate courts of this state, it is, we believe, more like those in which it has been held that a contract whereby one merchant sells his stock of goods and business to another, agreeing with the purchaser to retire from the mercantile business in the town for a stated period, and to use his efforts to secure his patronage and customers to the purchaser, is not unlawful as being in restraint of trade or as violating the statute prohibiting trusts. The leading case of this character is perhaps Gates v. Hooper, 90 Tex. 563, 39 S. W. 1079. In that case the Supreme Court said:

"In order to constitute a trust within the meaning of the statute there must be a 'combination of capital, skill, or acts by two or more.' 'Combination,' as here used, means union or association. If there be no union or association by two or more of their 'capital, skill, or acts' there can be no 'combination,' and hence no 'trust.'"

The court further said:

"When we consider the purposes for which the 'combination' must be formed to come within the statute, the essential meaning of the word 'combination,' and the fact that a punishment is prescribed for each day that the trust continues in existence, we are led to the conclusion that the union or association of 'capital, skill, or acts' denounced is where the parties in the particular case designed the united co-operation of such agencies, which might have been otherwise independent and competing, for the accomplishment of one or more of such purposes."

The evidence in the present case, as we view it, fails to disclose that Bomar and any other person or persons combined their "capital, skill, or acts," which might have been otherwise independent and competing, in the purchasing of the Galbraith plant. Bomar, Beardsley, Smith, and Cantey were not engaged in any sort of a competitive business. Smith was an attorney and trustee for Beardsley, and Cantey simply his attorney and legal adviser. Bomar either owned the Beardsley properties, including the ice and electric light plants, absolutely by reason of his purchase at the sale made under the judgment of the district court of Tarrant county, subject only to Beardsley's option to repurchase same, or Beardsley was the owner of said properties with Bomar in possession thereof as a mortgagee. There is testimony that Smith furnished something over $9,000 to be used in the operation of the Galbraith plant, and that, in the event Beardsley exercised his option to repurchase, he would pay to Bomar the amount paid out by him on said plant, but neither Beardsley, Smith, nor Cantey contributed any money towards the purchase of the Galbraith plant; that was furnished by Bomar, and if Bomar was a mere mortgagee in possession, as appellees contend, then his acts in the acquisition of the Galbraith plant were those of Beardsley's agent, and in law the acts of Beardsley, with the promise of Beardsley, in the event he availed himself of the option to repurchase said property, to return to Bomar such sums

as he should advance and pay out in the purchase of the Galbraith plant or incur on account of such purchase with the additional sum of $5,000 as compensation for his services as such agent. If Bomar was the absolute owner of the Beardsley properties under his said purchase, and Beardsley did not exercise his option to repurchase them, then the Galbraith plant was to become and did become the property of Bomar at his cost and expense. In either case "neither the capital, skill, nor acts" of the parties were brought into any kind of union, association, or cooperative action, within the meaning of the anti-trust statute as construed by our Supreme Court in the case to which we have just referred. The foregoing deduction we make from the evidence adduced shows that the present case is unlike Comer v. Burton-Lingo Co. et al., 24 Tex. Civ. App. 251, 58 S. W. 969, and other cases of like character, in which it was held that, where three independent and competing business concerns combined to buy and did buy the stock and good will of another competing concern with their joint funds for the purpose of preventing competition and to control prices was a violation of our anti-trust la,ws.

We are also of the opinion that the acquisition of the Galbraith plant by Bomar, under the facts shown, was not in violation of the common law.

What we have said disposes of the leading propositions contended for by appellants for a reversal of the case. There are many assignments of error, however, asserting propositions which have not been stated and discussed. Some of these assignments, in our opinion, disclose no reversible error, and others are predicated upon the erroneous assumption that the evidence conclusively established the existence of the facts essential to the maintenance of the propositions therein asserted. Hence they cannot on this appeal be sustained. If it should be found that Bomar was a mortgagee in possession, then we think appellees could recover the property involved in this suit only upon payment to Bomar within a reasonable time of such sum as he may show himself entitled to by virtue of the collateral trust notes, the contract of November 28, 1908, or other contracts.

[14-16] Any lien Capps, and Cantey, Moore, Smith & Moore, and Crawford & Cra,wford may have upon said property is subordinate, as we understand the record, to the right of Bomar to have the sums which he shows is due him and his right to hold said property as security therefor. If it should be found that Bomar was the absolute owner of said property, then such liens only as were acquired by persons not parties to the Tarrant county suit before he purchased the property at the sale under the judgment could be enforced against it. We also think that, if Bomar was a mortgagee in possession of the Beardsley properties, then the duty imposed upon him with respect to the preservation thereof, the sale of such portions of the same as became necessary, the incurring of debts, and collection of claims due, incidental to such possession or the operation of said properties, under the agreement therefor, was that of ordinary care, that is, such care as an ordinarily careful and prudent person situated as he was would have exercised in respect to those matters, and that his liability should be limited to the extent in which he failed to exercise such care. In such case he would also be entitled to reimbursement for necessary advances made by him to cover the expenses of operation and necessary improvements upon the plants, as well as money expended in the acquisition of the Galbraith plant, if it should appear upon another trial, as it does in the record on this appeal, that such expenses were incurred and advances and expenditures made at the instance and request of Beardsley for the protection of said properties and the enhancement of the value thereof. Lynch v. Ryan, 137 Wis. 13, 118 N. W. 174, 129. Am. St. Rep. 1040; Glieser v. McGregor, 85 Iowa, 489, 52 N. W. 366. With respect to the claim and lien established in favor of Stewart, Elliott, Chaplin & Blaney, which is complained of in appellants' thirty-eighth assignment of error, it is sufficient to say that we have not discovered any pleading that would authorize such action on the part of the trial court, and that without such pleading the court's judgment in that respect is erroneous.

[17] The report of the master in chancery seems to have been duly excepted to by the appellees; therefore the refusal of the trial court to admit it in evidence over their objection is not reversible error.

[18] The pleas of privilege of D. T. Bomar, Morgan Jones, and Fidelity Trust Company to be sued in Tarrant county, the county of their residences, were not well taken, because two of the defendants in the suit resided in Dallas county.

We have given the many questions arising on the appeal, and which must be viewed from various angles, the consideration and investigation their importance demands. It is regrettable that the litigation cannot be brought to a close by this appeal, but believing, as we do, that material error was committed in the trial court which requires a reversal of the case, and that judgment cannot be rendered in this court, the case must be remanded for another trial.

Reversed and remanded.